**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Albert Ward,                          )
                                      )
                Petitioner,           )   Case No. 1:07-CR-73-001
                                      )
        vs.                           )
                                      )
United States of America,             )
                                      )
                Respondent.           )

O R D E R

        This matter is before the Court on Petitioner Albert

Ward's motion to vacate, set aside, or correct sentence pursuant

to 28 U.S.C. § 2255 (Doc. No. 150).  For the reasons that follow,

the Court finds that an evidentiary hearing is not required on

two of Petitioner's assignments of error because the record

conclusively shows that Petitioner is not entitled to relief on

them.  The Court does, however, find that one of Petitioner's

claims warrants an evidentiary hearing.  Accordingly,

Petitioner's motion to vacate, set aside or correct sentence is

**DENIED IN PART.**

I. Background

        What began as a lover's quarrel between Kyron Thomas

and Tosia Clemons ended with the Middletown Police Department

conducting a consensual search of Petitioner's hotel room and

finding approximately 792 grams of cocaine base in the

refrigerator.  In June 2007, the grand jury in this district

returned an indictment charging Petitioner, Thomas, and Brandon

Davis with conspiracy to possess with intent to distribute in

1

excess of 50 grams of cocaine base, in violation of 21 U.S.C. § 846 (Count 1). As is relevant here, Count 2 of the indictment charged Petitioner with possession with intent to distribute in excess of 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A). Count 4 of the indictment charged Petitioner with maintaining a place for the purpose of distributing a controlled substance, in violation of 21 U.S.C. § 856.

Thomas and Davis eventually entered into plea agreements with the government. As will be discussed in more detail below, Petitioner and the government did not enter into a plea agreement and the case proceeded to a jury trial in September 2008. The day before the trial started, the government dismissed Count 1 (Doc. No. 105) but also filed an information pursuant to 21 U.S.C. § 851. Doc. No. 107. The filing of the § 851 information increased the mandatory minimum sentence on Count 2 to twenty years of imprisonment. The jury convicted Petitioner on both counts after a two day trial. Doc. No. 116. Petitioner came before the Court for sentencing on February 18, 2009. The Court sentenced Petitioner to 240 months of imprisonment on Count 2, the mandatory minimum sentence, and 235 months of imprisonment on Count 4, with the terms of imprisonment to be served concurrently.

Petitioner filed a timely notice of appeal from the judgment of the Court. On appeal, Petitioner challenged the Court's denial of his motion to suppress and the Court's

calculation of his criminal history score pursuant to the Sentencing Guidelines.  The Court of Appeals affirmed this Court's ruling on both the motion to suppress and the calculation of Petitioner's criminal history score.  United States v. Ward, 400 Fed. Appx. 991 (6th Cir. 2010).

Petitioner then filed this timely motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. Petitioner's motion raises three separate ineffective assistance of trial counsel claims.  First, Petitioner claims that trial counsel was ineffective for failing to challenge the racial composition of the venire panel and the final jury.  Second, Petitioner claims that trial counsel was ineffective during plea negotiations for failing to advise him correctly about the Sentencing Guidelines range applicable to the charged offenses. Third, Petitioner claims that trial counsel was ineffective for failing to move to dismiss the indictment because of an alleged violation of the Speedy Trial Act.

## II. Standard of Review

To warrant relief under 28 U.S.C. § 2255, a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict.  Humphress v. United States, 398 F.3d 855, 858 (6th Cir. 2005).  Relief is warranted only where a petitioner has shown "a fundamental defect which inherently results in a complete miscarriage of justice."

3

<u>Davis v. United States</u>, 417 U.S. 333, 346 (1974). Claims of ineffective assistance of counsel are appropriately brought by filing a motion under § 2255. <u>United States v. Galloway</u>, 316 F.3d 624, 634 (6th Cir. 2003).

To prevail on a claim of ineffective assistance of counsel, a petitioner must establish two elements: 1) counsel's performance fell below an objective standard of reasonableness, and 2) there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> In the context of rejecting a plea agreement, in order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that but for counsel's error, he would have accepted a plea agreement instead of proceeding to trial. <u>Short v. United States</u>, 471 F.3d 686, 696 (6th Cir. 2006).

Finally, the Court must consider whether an evidentiary hearing is required on Petitioner's § 2255 motion. A hearing is mandatory "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." <u>Smith v. United States</u>, 348 F.3d 545, 550 (6th Cir. 2003). Thus, no hearing is required if the petitioner's allegations "cannot be accepted as true because they are

contradicted by the record, inherently incredible, or conclusions rather than statements of fact." <u>Valentine v. United States</u>, 488 F.3d 325, 333 (6th Cir. 2007). "[T]he burden on the petitioner in a habeas case for establishing an entitlement to an evidentiary hearing is relatively light." <u>Turner v. United States</u>, 183 F.3d 474, 477 (6th Cir. 1999).

## III. <u>Analysis</u>

The Court takes up Petitioner's claims somewhat out of order as it concludes the first and third assignments of error are without merit. Accordingly, the Court addresses those two claims first and Petitioner's second assignment of error last.

### A. <u>The Racial Composition of the Jury</u>

Petitioner, who is African-American, alleges that trial counsel was ineffective for failing to challenge the racial composition of the venire panel and the final jury. The Court takes up these sub-issues seriatim.

#### 1. <u>Venire Panel</u>

The Sixth Amendment requires that the venire panel from which the jury is ultimately selected represent a "fair cross-section" of the community. <u>United States v. Allen</u>, 160 F.3d 1096, 1103 (6th Cir. 1998). In order to establish a prima facie violation of the fair cross-section rule, a criminal defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in

the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. Id. A criminal defendant must demonstrate more than just under-representation on his particular panel; rather, he must show underrepresentation on all the venire panels in the judicial district over a relevant period of time. See id. at 1103 ("we look at the 'venires' from which 'juries' are selected"); id. at 1103 n.5 ("[The] court must look at the overall period of time during which venires were chosen, and compar[e] jury pool and relevant population percentage.") (citing Ford v. Seabold, 841 F.2d 677, 683-84 & n.4 (6th Cir. 1988)). A defendant, however, is not entitled to a panel of any particular composition. Allen, 160 F.3d at 1103.

In this case, Petitioner argues that African-American males were underrepresented on the venire. Petitioner, however, has failed to demonstrate that African-Americans or males were unrepresented on the venire panel, much less that they were systematically excluded from jury selection.

Case records indicate that 37 persons were called in the venire. Doc. No. 114. By Petitioner's count, 5 of the 37, or 13.5%, of veniremen were African-American. Doc. No. 156, at 2. Petitioner contends that African-Americans comprise 25% of the population of Hamilton County and that, therefore, there should have been 4 more African-Americans in the panel for there to have been a fair cross-section of the community. The Court's records, however, indicate that 4 of the 37 veniremen were

African-American, or of mixed race (Jurors 3, 8, 9, and 20).
Thus, about 10.8% of the venire was African-American or of mixed
race. Petitioner's argument, though, overlooks that the
Cincinnati Division of the Western Division of the Southern
District of Ohio draws jurors from more than just Hamilton
County. In fact, this division also draws from Adams, Brown,
Butler, Clermont, Clinton, Highland, Lawrence, Scioto, and Warren
Counties. See United States v. Odeneal, 517 F.3d 406, 412 (6th
Cir. 2008)(indicating that the judicial district, not the county,
is the relevant community for determining whether a distinctive
group is underrepresented). This Court observed in another trial
that took place not quite a year after Petitioner's trial that
African-Americans comprise approximately 13.2% of the population
of the Southern District of Ohio. See United States v. Carter,
Case No. 1:08-CR-51 (S.D. Ohio), Doc. No. 98, at 13. Thus, the
disparity between the percentage of African-Americans called for
jury duty in Petitioner's case and the percentage of African-
Americans residing in the district - about 2.4% - is insufficient
as a matter of law to show that African-Americans were
substantially underrepresented on Petitioner's venire. Compare
with United States v. Booker, 367 Fed. Appx. 571, 574 (6th Cir.
2007) (disparity of 2.63% was insufficient to establish violation
of the fair cross-section requirement); United States v. White,
Nos. 95-2059, 95-2158, 95-2159, 95-2160, 1997 WL 345730 , at *2
(6th Cir. June 20, 1997) (African-Americans not underrepresented
where they comprised 5.61% of the jury wheel but only 2.5% of the

venire). Accordingly, African-Americans were not underrepresented in Petitioner's venire.[1]

The same records indicate that 12 of the 37, or approximately, 33%, of the venire panel were male. Assuming that males were underrepresented in this panel, it is highly unlikely that the jury selection procedures in this district systematically exclude males from jury service. Petitioner has not made a prima facie showing of a violation of the cross-section rule with respect to male jurors.

Accordingly, Petitioner has not made out a prima facie violation of the "fair cross-section" rule. Consequently, Petitioner has not demonstrated that his trial counsel's representation fell below an objective standard of reasonableness by failing to object to the composition of the venire panel.

2. Batson

---

[1]     To the extent that Petitioner is contending that African-American males were underrepresented in the venire, no federal court has ever held that African-American males comprise a distinctive group for purposes of the fair cross-section requirement. See United States v. Barlow, 732 F.Supp.2d 1, 27-28 (E.D.N.Y. 2010)(collecting cases). The main concern with combining race and gender to form a distinctive group is that numerous other characteristics can be mixed together and violations can be found based on the exclusion of groups that comprise a small part of the population. Id. at 28. The Court agrees with this analysis. A criminal defendant is entitled to have a jury panel representing a fair cross section of the community, not a mirror image of the demographics of the community. See Taylor v. Louisiana, 419 U.S. 522, 538 (1975)("It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.")

The Equal Protection Clause prohibits the prosecution from using its peremptory challenges to strike a juror because of his or her race. <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). Petitioner claims that his trial counsel was ineffective for failing to object to the government's use of one of its peremptory challenges to strike the last remaining African-American juror on the panel.

The record indicates that the Court struck three of the four African-American or mixed-race venireman from the panel for cause. Striking jurors for cause, however, does not raise a <u>Batson</u> issue. <u>United States v. Elliott</u>, 89 F.3d 1360, 1364-65 (8th Cir. 1996). The government then used one of its six peremptory challenges to strike Juror 3, whom Court records indicate was African-American. Doc. No. 113. The government, however, only used four of its six peremptory challenges and it did not exercise the one peremptory challenge it had for use against an alternate juror. Petitioner's trial counsel did not object to the government's use of one of its peremptory strikes against Juror 3.

The Court concludes that Petitioner has failed to demonstrate that trial counsel committed an unprofessional error in failing to raise a <u>Batson</u> challenge to the government's use of one of its peremptory challenges to strike Juror 3. On this record, it seems likely that the Court would have overruled any <u>Batson</u> challenge raised by Petitioner's counsel. In order to establish a prima facie <u>Batson</u> violation, the defendant must

show: (1) that he or she is a member of a cognizable racial
group, (2) that the proponent of the strike has used peremptory
challenges to remove from the venire members of the strike
opponent's race, and (3) that the relevant circumstances raise an
inference that the proponent of the strike excluded prospective
jurors from the petit jury because of their race. <u>United States
v. Watford</u>, 468 F.3d 891, 911-12 (6th Cir. 2006). If the
defendant makes out a prima facie violation, the government has
an opportunity to provide a race-neutral reason for striking the
juror. <u>Id.</u> If the government meets that burden, the trial court
"has the responsibility to assess the strike proponent's
credibility under all of the pertinent circumstances, and then to
weigh the asserted justification against the strength of the
strike opponent's prima facie case under the totality of
circumstances." <u>Id.</u> (internal quotation marks and brackets
omitted).

Having reviewed the voir dire transcript (Doc. No.
114), the Court is persuaded that any <u>Batson</u> challenge that trial
counsel might have raised would have failed because the
surrounding circumstances fail to indicate that the prosecution
struck Juror 3 because of her race. For purposes of a <u>Batson</u>
challenge, the relevant circumstances in which a peremptory
strike occurs include:

> 1) the racial composition of the initial group seated
> and the final jury panel sworn; 2) the number of
> peremptory strikes allowed each side; and 3) the race
> of those who were struck or excused from the jury panel
> throughout voir dire (whether for cause or by a

peremptory challenge), the order of strikes, and by whom they were exercised. In an appropriate case, it may also be useful to consider evidence as to the percentage of the "cognizable racial group" in the jury pool, or the racial composition of the district wherein the jury pool is selected.

United States v. Hill, 146 F.3d 337, 342 (6th Cir. 1998).

Additionally, a pattern of strikes against African-American jurors might give rise to an inference of discrimination. United States v. Sangineto-Miranda, 859 F.2d 1501, 1520 (6th Cir. 1988). The trial court may also consider the prosecutor's questions and statements during the voir dire examination to see if they support or refute an inference of discriminatory purpose. Id.

In this case, three of the four African-American or mixed-race jurors in the venire were struck for cause. It was the Court, however, who initially suggested that Juror 9 (mixed-race), Juror 20 (African-American), and Juror 37 (Caucasian) were removable for cause. Doc. No. 140, at 76. Juror 9 indicated he suffered from schizophrenia and Juror 20 indicated that she would require the government to prove the charges beyond all possible doubt and could not be convinced that another lesser standard should apply. Id. at 75-76. The Court also identified Juror 8 (African-American) as a juror potentially excusable for cause because at the time she had a high-risk pregnancy and needed to see her doctor twice a week. The fact that the Court, and not the government, first suggested that Juror 8, Juror 9, and Juror 20 were removable for cause negates an inference that the government used the voir dire process to exclude jurors because of their race.

11

Both sides exercised their peremptory challenges simultaneously, which is the Court's standard voir dire procedure. Thus, there is no indication that the government engaged in a pattern of striking African-American jurors.

Nothing in the government's voir dire examination suggests that race played a part in the exercise of its peremptory challenges. The government's voir dire focused on two main topics, situations where police respond to a report of one crime and subsequently discover other crimes taking place, which was the basic fact pattern of this case, and whether any juror's neighborhood had been affected by drug dealing. Doc. No. 140, at 49-63. Neither of these themes is remotely racial, and, indeed, the prosecutor's questions elicited responses from a variety of jurors.

Finally, the government exercised four of its six available peremptory challenges. In addition to Juror 3, the government also struck Juror 6, Juror 10, and Juror 36, all of whom were Caucasian. In reviewing these jurors' answers to the voir dire questions, they each have a common non-racial characteristic which is the most likely explanation for being struck by the government - each of these jurors could reasonably be perceived as someone who would might view a criminal defendant sympathetically. Juror 10 responded to one question that he had done criminal defense work in the past. Doc. No. 140, at 31. Jurors 3, 6, and 36 all indicated that they had had family members who had either been charged with or who had been

convicted of criminal offenses. Juror 3 stated that her brother had been charged but acquitted on a drug offense. Id. at 32. Juror 6's nephew had a felony assault charge pending at the time. Id. Juror 36's brother had apparently been convicted on drug charges. Id. at 33. It seems highly unlikely that the government's decision to strike these four jurors was coincidental given the conspicuousness of the one common characteristic of their backgrounds.

Thus, none of the circumstances of this case indicate that the government used its peremptory challenges to remove African-Americans from Petitioner's jury. Accordingly, Petitioner's attorney was not ineffective for failing to raise a Batson challenge at trial.

### B. Alleged Speedy Trial Violation

Petitioner contends that his trial counsel was ineffective for failing to seek dismissal of the indictment because of a violation of the Speedy Trial Act. The Speedy Trial Act, with certain time periods excluded, requires the trial of a criminal defendant to begin within 70 days of the filing of the indictment or the defendant's first appearance before a judicial officer, which ever last occurs. 18 U.S.C. § 3161(c)(1). Examination of the record in this case shows that Petitioner's rights under the Speedy Trial Act were not violated. Therefore, Petitioner's attorney was not ineffective for not raising a Speedy Trial Act objection before trial.

The grand jury returned the indictment in this case on

13

June 20, 2007.  Doc. No. 13.  Petitioner was the last defendant to make his initial appearance before a judicial officer.  This occurred on July 12, 2007.  Doc. No. 22.  In a multi-defendant case, the Speedy Trial clock starts when the last defendant makes his first appearance before a judicial officer.  <u>United States v. Coviello</u>, 280 Fed. Appx. 520, 523 (6th Cir. 2008).  Therefore, the Speedy Trial clock started on July 12, 2007.

On July 16, 2007, then-Magistrate Judge Black held a detention hearing with Petitioner and counsel present.  Doc. No. 24.  This day was excludable pursuant to § 3161(h)(1) as a proceeding concerning the defendant.  <u>United States v. Salgado</u>, 250 F.3d 438, 454 n.2 (6th Cir. 2001).

Three days elapsed so far.

Defendants Davis and Thomas were arraigned on July 17, 2007.  This day was excludable as to Petitioner.  <u>United States v. Sobh</u>, 571 F.3d 600, 603 (6th Cir. 2009) ("[T]he excludable delay of one codefendant is excludable delay for all codefendants[.]").

On August 10, 2007, both Petitioner and Defendant Thomas filed motions to suppress.  Doc. Nos. 32 & 33.  The filing of the motions to suppress tolled the Speedy Trial clock.  18 U.S.C. § 3161(h)(1)(D).

Twenty-three days elapsed between July 17 and August 10.  The total days elapsed so far is twenty-six.

The Court held an evidentiary hearing on Defendant Thomas's motion to suppress on October 3, 2007.  Doc. No. 50.

14

Thomas and the government submitted post-hearing briefs on February 6, 2008 and February 13, 2008, respectively.  Doc. Nos. 72 & 73.  The Court issued an order denying Thomas's motion to suppress on February 26, 2008.  Doc. No. 74.  Thus, the Speedy Trial clock was tolled from at least August 10, 2007 through February 26, 2008.  Henderson v. United States, 476 U.S. 321, 330-31 (1986); 18 U.S.C. § 3161(h)(1)(H) (up to 30 days excludable while a matter is under advisement by the court).

In the interim, however, other events were occurring. Petitioner first withdrew his motion to suppress on October 3, 2007, Doc. No. 50, but reinstated it on October 9, 2007.  Doc. No. 53.  On October 10, 2007, the Court entered an order committing Petitioner for a pre-trial psychiatric evaluation. Doc. No. 54.  The Court received the psychiatric report from the Bureau of Prisons on March 26, 2008.  Doc. No. 77.  It is not immediately apparent when the Court found that Petitioner was competent to stand trial.  There was, however, a status conference concerning Petitioner on March 31, 2008.  Presumably, this is when the Court determined that Petitioner was competent to stand trial.

In any event, the Court held an evidentiary hearing on Petitioner's motion to suppress on June 4, 2008.  Doc. No. 80. The Court entered an order denying Petitioner's motion to suppress on June 27, 2008.  Doc. No. 84.  Thus, all of the delay between October 3, 2007 and June 27, 2007 was excludable time. See Henderson, supra.

On July 3, 2008, Petitioner filed a motion to continue the trial date, which at that time was scheduled to begin on July 29, 2008. Doc. No. 86. In the motion, Petitioner's trial counsel asked to move the trial date because of a scheduling conflict. The filing of the motion to continue tolled the Speedy Trial clock again.

Five days elapsed between June 27, 2008 and July 3, 2008. The total days elapsed so far is thirty-one.

The Court held a conference on Petitioner's motion to continue the trial on July 11, 2008 and granted the motion the same day. Doc. No. 88. The Court rescheduled the trial to begin on September 15, 2008. In the same order, the Court found that the ends of justice in granting the continuance to allow for effective trial preparation, and to accommodate trial counsel's schedule, outweighed Petitioner's and the public's interest in a speedy trial. Thus, all of the time between July 3, 2008 and September 15, 2008 was excludable delay. 18 U.S.C. § 3161(h)(7)(A); United States v. Strickland, 342 Fed. Appx. 103, 110-11 (6th Cir. 2009) (trial court did not err in granting ends of justice continuance to accommodate schedule of defendant's trial counsel).

The trial actually commenced on September 16, 2008. Doc. No. 110.

Thus, in summary, only 31 days elapsed from the 70 day Speedy Trial clock. There was no violation of the Speedy Trial Act. Consequently, Petitioner's trial counsel was not

ineffective for not moving to dismiss the indictment based on a
Speedy Trial Act violation.

## C. Plea Negotiations

Finally, Petitioner contends that his trial counsel was
ineffective during plea negotiations for failing to properly
advise him of the Sentencing Guidelines range applicable to his
offense.  Specifically, and it does not appear to be disputed by
the government, it appears that defense counsel presented
Petitioner with a plea offer from the government which stipulated
that the base offense level applicable to his offense was 36 when
the correct base offense level was 34.  "A failure to provide
professional guidance to a defendant regarding his sentence
exposure prior to a plea may constitute deficient assistance."
Moss v. United States, 323 F.3d 445, 474 (6th Cir. 2003).  The
duty to properly advise the defendant of his sentencing exposure
includes an accurate estimation of how the Sentencing Guidelines
apply to his case.  Smith v. United States, 348 F.3d 545, 553
(6th Cir. 2003)("[W]e do not see how sentence exposure can be
fully explained without completely exploring the ranges of
penalties under likely guideline scoring scenarios, given the
information available to the defendant and his lawyer at the
time.").  To establish prejudice from trial counsel's alleged
inadequate representation during plea negotiations, however, a
petitioner still must demonstrate a reasonable probability that
but for counsel's unprofessional error he would have accepted a
plea agreement instead of going to trial.  Short v. United

<u>States</u>, 471 F.3d 686, 696 (6th Cir. 2006).

From the record, it appears that the government offered Petitioner at least three opportunities to enter into a plea agreement. The first opportunity apparently occurred early on in the case when Petitioner was represented by William Welsh, Esq. <u>See</u> Doc. No. 141, at 4. Mr. Welsh was obliged to withdraw from representing Petitioner in August 2007 due to a conflict of interest. The second time the government offered a plea agreement was in May 2008. <u>Id.</u> at 6-7. The last time the government offered a plea agreement to Petitioner was on or about September 11, 2008, just a few days before trial. <u>See</u> <u>id.</u> at 5. It appears that the government provided Petitioner with the same draft plea agreement in September 2008 that it offered through Mr. Welsh early in the case. <u>Id.</u> at 4-5.

The Court observes that at the time Petitioner was indicted in June 2007, the base offense level for possession of 790 grams of cocaine base was 36. <u>See</u> U.S.S.G. § 2D1.1(2) (2006 Sentencing Guidelines Manual). Assuming that Petitioner would have received a three point reduction pursuant to U.S.S.G. § 3E1.1 for acceptance of responsibility and a timely plea, the final offense level would have been 33. Petitioner's criminal history category was III. The Sentencing Guidelines range, therefore, would have been 168 to 210 months of imprisonment.

By the time September 2008 came around, however, the Sentencing Commission had amended § 2D1.1 and lowered the base offense level for 790 grams of cocaine base to 34. With the same

reductions and criminal history category, the final offense level would have been 31 and the Sentencing Guidelines range would have been 135 to 168 months of imprisonment.  It appears that everyone, save perhaps Petitioner, failed to realized that the applicable base offense level had been lowered.  The true import of Petitioner's decision to reject the plea agreement in September 2008, however, is that once he had done so, the government filed the § 851 information.  The filing of the information triggered the application of a mandatory 240 month minimum term of imprisonment, which is substantially above the sentencing range that was available had a plea agreement been offered and accepted with the correct base offense level of 34.  Therefore, Petitioner has demonstrated an unprofessional error by trial counsel.

Petitioner, of course, must still show a reasonable probability that he would have accepted a plea agreement instead of going to trial in order to establish prejudice resulting from counsel's error.  In this regard, Petitioner's motion is less than clear.  Petitioner states in his memorandum that he recognized that the plea agreement contained the wrong base offense level, that he brought the error to counsel's attention, and that counsel ignored him.  Petitioner then states that he decided to proceed to trial because a sentence under base offense level 36 offered the same amount of imprisonment as if he went to trial.  This contention makes little sense, however, because even if Petitioner was advised of the base offense level incorrectly,

by proceeding to trial he would have waived reductions for acceptance of responsibility and a timely plea, and, consequently, an opportunity for a lower advisory Guidelines range.

The government, on the other hand, has supplied an affidavit from Stephan Madden, Esq., Petitioner's trial counsel, in opposition to Petitioner's motion. Mr. Madden states that he felt that the evidence against Petitioner was substantial and that he advised Petitioner to accept the plea agreement. Mr. Madden states further, however, that Petitioner was adamant that the Court's ruling denying his motion to suppress was erroneous and would be reversed on appeal. For that reason, according to Mr. Madden, Petitioner never considered entering into a plea agreement with the government. Mr. Madden states further that in his opinion, Petitioner would not have accepted a plea agreement even if it had been based on an base offense level of 34 and a further 3 point reduction for acceptance of responsibility and entering a timely plea. Doc. No. 155-1. The government relies on Mr. Madden's affidavit to establish that Petitioner was not prejudiced by counsel's alleged error.

As indicated above, a petitioner's burden to establish entitlement to an evidentiary hearing on a § 2255 motion is "relatively light." Here, there is apparent agreement that Petitioner was incorrectly advised about the applicable Sentencing Guidelines range. This error had a significant effect on Petitioner's sentencing exposure since his rejection of the

plea agreement effectively increased his sentence by at least 72 months, or six years. The substantial increase in sentencing exposure is sufficient to establish, at least prima facie, that there is a reasonable probability that Petitioner would have accepted a plea agreement. See United States v. Morris, 470 F.3d 596, 602-03 (6th Cir. 2006) (holding there was a reasonable probability that the defendant would have accepted a plea agreement had he been properly advised where the sentencing range increased from 60 to 68 months of imprisonment to 101 to 111 months of imprisonment). Moreover, there are factual issues concerning the course of plea negotiations, as well as credibility issues concerning whether Petitioner was or was not willing to accept a plea agreement under any circumstances. None of these issues can be resolved on a paper record.

Conclusion

Accordingly, the Court concludes that Petitioner is entitled to an evidentiary hearing on his ineffective assistance of counsel claim as it relates to the advice he received during plea negotiations. Pursuant to Rule 8(c) of the Rules Governing § 2255 Proceedings, the Court will appoint counsel to represent Petitioner on this claim. The record, however, conclusively establishes that Petitioner's other two ineffective assistance of counsel claims are without merit. Petitioner is not entitled to an evidentiary hearing on those claims. Those assignments of error are not well-taken and are **OVERRULED.**

**IT IS SO ORDERED**

Date  January 18, 2012              s/Sandra S. Beckwith
                                    Sandra S. Beckwith
                         Senior United States District Judge